IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

ERNESTO URIBE                                                                                         PLAINTIFF
Fed. Reg. #66105-079

V.                                            NO.  2:08cv00019 JWC

T.C. OUTLAW, Warden,                                                                           DEFENDANTS
FCI, Forrest City, AR, et al

MEMORANDUM OPINION AND ORDER

**I.  Background**

Plaintiff is a pro se inmate currently confined to the Federal Correctional Institution in Forrest City, Arkansas ("FCI").  On February 5, 2008, Plaintiff filed this Bivens action[1] pursuant to 28 U.S.C. § 1331 based on the alleged violation of his Eighth Amendment medical rights (see doc. 2).  On April 21, 2008, Defendants filed a motion to dismiss (or, in the alternative, a motion for summary judgment) and brief in support (doc. 11, 12) seeking to dismiss Plaintiff's complaint on the grounds that he has failed to state a claim for deliberate medical indifference.  In addition, Defendants contend they are entitled to the protections of absolute, qualified, and sovereign immunity.  By order entered May 28, 2008 (doc. 23), Plaintiff was notified of his opportunity to file a responsive pleading opposing Defendants' motion.  In addition, Plaintiff was advised that since Defendants had attached evidence to their brief, the Court may construe the motion as one for summary judgment.[2]

---

[1] Because Plaintiff is a federal inmate alleging a constitutional violation against federal defendants, his claims are brought pursuant to Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), which established that the victims of constitutional violations by federal agents have a right to recover damages against the official in federal court, just as 42 U.S.C. § 1983 provides redress for constitutional violations by state officials.

[2] See Country Club Estates, L.L.C. v. Town of Loma Linda, 213 F.3d 1001, 1005 (8th Cir. 2000) ("Under Rule 12(b), if, on a motion to dismiss, a party submits to the court material outside the motion, and the court does not exclude this material, the motion then becomes a motion for summary judgment under Rule 56 . . . . a party against whom this procedure is used . . . is normally

Plaintiff was therefore advised that his response to Defendants' motion may include opposing or counteraffidavits, executed by him or other persons, which have either been sworn to under oath or declared to under penalty of perjury in accordance with 28 U.S.C. § 1746. Pursuant to Local Rule 56.1 of the Rules of the United States District Court for the Eastern District of Arkansas, Plaintiff was also advised to file a separate, short and concise statement setting forth the facts which he thought should be decided at trial. Plaintiff has responded to the motion (see doc. 33) and Defendants have replied (doc. 34).

According to Plaintiff's complaint (doc. 2), he has suffered with lower back, neck, and shoulder pain throughout his entire incarceration. On October 18, 2002, while incarcerated at the FCI in La Tuna, Texas, Plaintiff was given an MRI and diagnosed with disc herniation at L4-5 centrally and to the left and a pinched nerve.[3] Several months later it was recommended that he receive epidural steroid injections ("EPI"), which he began receiving in July 2003. In September 2003, Plaintiff was transferred to the FCI in Forrest City. Once there he informed Defendant Prince of the treatment he had been receiving. In December 2003, Plaintiff received a second EPI. He claims he informed Defendants Prince and Gaia that he was deriving little relief from the injections and requested alternative treatments. Three years and four months later, Plaintiff began the grievance process by filing a BP-9 requesting medical attention for the extreme pain caused by the delay in proper treatment. Defendant Outlaw responded that a review of Plaintiff's medical

---

entitled to notice that conversion is occurring. Only if he has such notice can he understand that the burden will be on him to produce affidavits, not merely allegations in pleadings, to rebut what has become a motion for summary judgment. The general rule in this Circuit is that 'strict compliance' with this notice procedure is required.").

[3] In his response to Defendants' motion, Plaintiff alleges he was diagnosed as suffering "disc herniation at L5-S1 centrally and to the right; and disc protrusion or herniation at L4-5 centrally and to the left" (see doc. 33).

records indicated that he had not displayed any decrease in maintaining any daily activities and recommended conservative management due to the possibility that surgery could result in physical limitation and disability. Plaintiff alleges that Defendant Outlaw was deliberately indifferent to his serious medical needs, ignoring both his extreme pain and the fact that he had been previously terminated two years earlier from his job assignment with the Federal Prison Industries UNICOR due to his medical condition. Plaintiff additionally claims that Defendant Outlaw ignored his serious medical condition because he did not want to incur the costs of treatment by an outside specialist. He holds Defendant Outlaw liable in a supervisory capacity.[4]

On August 4, 2007, Plaintiff requested a re-evaluation of his back, neck, and shoulder since the anti-inflammatory drugs had failed to cure the root cause of his pain. Plaintiff contends that his medical records will show how many times he was seen by the medical staff and that staff knew that his course of treatment was largely ineffective and had done nothing to improve his condition. Plaintiff appealed his claim to the highest level, the National Inmate Appeals Administrator, who found that he had been evaluated by medical staff, he had been approved on September 11, 2007, for another MRI, and that he was receiving medical care and treatment in accordance with Bureau of Prison policy. Plaintiff contends that Defendants' failure to refer him to a specialist in a timely manner demonstrates deliberate indifference. He further contends that the deprivation of the proper prescribed medication "for the last 48 months" also rises to the level of an Eighth Amendment violation.[5] In his response to Defendants' motion, Plaintiff alleges that his

---

[4] See doc. 2, fn.2.

[5] Plaintiff claims he was prescribed Naproxen.

condition has deteriorated and now causes numbness in both lower extremities and hips, and causes him difficulty walking, sitting, and standing (see doc. 33).

## II. Standard

Summary judgment[6] is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court must view the evidence in the light most favorable to the nonmoving party, giving him the benefit of all reasonable factual inferences. Reed v. ULS Corp., 178 F.3d 988, 990 (8th Cir. 1999). A moving party is entitled to summary judgment if the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he will have the burden of proof at trial. Celotex, 477 U.S. at 322-23. To avoid summary judgment, the nonmovant must go beyond the pleadings and come forward with specific facts, "by [his] own affidavit" or otherwise, showing that a genuine, material issue for trial exists. Id. at 324; Fed. R. Civ. P. 56(e). A nonmovant has an obligation to present affirmative evidence to support his claims. Settle v. Ross, 992 F.2d 162, 163-64 (8th Cir. 1993). A litigant's verified complaint is generally considered an affidavit for purposes of summary judgment. Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994).

---

[6] Since Defendants have submitted documentation which the Court relies upon, and since Plaintiff has responded to Defendants' motion, thus negating any potential claim of unfair surprise, Defendants' motion will be construed as one for summary judgment.

### III.  Analysis

**A.     Sovereign Immunity**

Defendants first contend that Plaintiff's claims against them in their official capacities are barred by the doctrine of sovereign immunity.  They are correct.  Bivens claims can be brought against federal officers in their individual capacities only; they do not apply to federal officers acting in their official capacities.  Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 69-71 (2001).  Plaintiff seeks $10,000,000 in compensatory and punitive damages from Defendants, as well as professional treatment for his back, neck, and shoulder pain.  On the front page of his complaint, Plaintiff very clearly indicates that he is suing Defendants in both their official and personal capacities.  Plaintiff's claim for monetary damages against Defendants in their individual capacities clearly is not barred; however, his claim for monetary damages against Defendants in their official capacities is barred.  Buford v. Runyon, 160 F.3d 1199, 1203 (8th 1998) (citing Laswell V. Brown, 683 F.2d 261, 268 (8th Cir. 1982)) ("It is well settled that a Bivens action cannot be prosecuted against the United States and its agencies because of sovereign immunity.").

**B.     Deliberate Medical Indifference**

To prevail on his claim of deliberate medical indifference, Plaintiff must allege acts or omissions by Defendants "sufficiently harmful to evidence deliberate indifference to [his] serious medical needs."  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  The Eighth Circuit has interpreted this standard to include both objective and subjective components: "The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs."  Jolly, 205 F.3d at 1096 (citing Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)); see also Stetter

v. Riddick, 6 Fed. Appx. 522 (8th Cir. 2001) (unpub. per curiam) (citing Moore v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997)). This standard has been well settled for some time and Plaintiff's burden is substantial. In determining whether Defendants were deliberately indifferent to his serious medical needs, Plaintiff must demonstrate "more than negligence, more even than gross negligence." Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). Moreover, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Id.

First, Plaintiff must establish that he suffered from an objectively serious medical need. A medical need is "serious" if it has been diagnosed by a physician as mandating treatment or if it is so obvious that even a lay person would recognize the necessity for a physician's treatment. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); see also Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir. 1999). Next, Plaintiff must establish that Defendants were (1) personally aware of his serious medical needs; and (2) deliberately disregarded those needs. Coleman, 114 F.3d at 785-86.

When an inmate is complaining about a delay in treatment, as Plaintiff herein is, the objective "seriousness" of the deprivation must be measured by reference to the *effect* of any delay. Coleman, 114 F.3d at 784 (citing Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)). To succeed on his claim, Plaintiff must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment, i.e., that Defendants ignored a critical or escalating situation, or that the delay adversely affected his prognosis. Id.; Beyerbach v. Sears, 49 F.3d 1324, 1326-27 (8th Cir. 1995).[7]

---

[7] See also the following unpublished cases of Jackson v. Hallazgo, 30 Fed. Appx. 668 (8th Cir. Mar. 6, 2002) (unpub. per curiam) (citing Coleman, 114 F.3d at 784) ("[a]n inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs"); O'Neal v. White, 221

Generally, a supervisory official cannot be liable under Bivens for alleged medical mistreatment unless he was personally involved in the violation or where his corrective inaction constitutes deliberate indifference toward the violation. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995) (citing Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993)); see also Johnson v. Lockhart, 941 F.2d 705, 707 (8th Cir. 1991) ("Abdication of policy-making and oversight responsibilities can reach the level of deliberate indifference when tacit authorization of subordinates' misconduct causes constitutional injury"). To be held liable, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." Boyd, 47 F.3d at 968 (quoting Ripson v. Alles, 21 F.3d 805, 809 (8th Cir. 1994)).

### 1. Defendant Outlaw

Plaintiff contends that Defendant Outlaw ignored his serious medical needs because he did not want to incur the costs of treatment by an outside specialist. The only specific allegation Plaintiff makes against Defendant Outlaw is that he responded to Plaintiff's BP-9 and noted that conservative management of his symptoms was recommended. Warden Outlaw has no medical training and was not involved in any decisions regarding Plaintiff's medical treatment (see doc. 12, Exh. A, Declaration of Warden T.C. Outlaw). Moreover, Plaintiff does not allege that Defendant Outlaw actually participated in the alleged violations, but rather seeks to hold him liable for the other Defendants' actions under a respondeat superior theory. As with actions under 42 U.S.C. § 1983, there is no respondeat superior liability in Bivens actions; Defendants are liable for their personal acts

---

F.3d 1343 (8th Cir. July 12, 2000) (unpub. per curiam) (citing Crowley, 109 F.3d at 502) (concluding that plaintiff's "failure to submit verifying medical evidence to show a detrimental effect from any delay in tests, surgery, or alternative treatments was fatal to his Eighth Amendment claim").

7

only.  Buford v. Runyon, 160 F.3d 1199, 1203 n.7 (8th 1998) (citing Estate of Rosenberg, 56 F.3d at 37); see also Muick v. Reno, 83 Fed. Appx. 851, 853 (8th Cir. 2003) (unpub. per curiam) (affirming grant of summary judgment in Bivens action; claims against supervisors properly dismissed as there is no respondeat superior liability under Bivens).  For this reason, Plaintiff's claim against Defendant Outlaw fails.

### 2. Defendant Gaia

Defendant Gaia contends that she is entitled to absolute immunity from suit under the Public Health Service Act, codified at 42 U.S.C. §233(a).  Section 233(a) makes the Federal Torts Claim Act ("FTCA")[8] the exclusive remedy for specified actions against members of the Public Health Service.  From March 2005 to the present, Defendant Gaia has been detailed to the FCC in Forrest City, Arkansas, as a mid-level practitioner.  Defendant Gaia is an active duty commissioned officer of the United States Public Health Services, and at all times was acting within the scope of her employment (doc. 12, Exh. B, Declaration of CDR Ben Brown, RN, MPA).  42 U.S.C. § 233(a) provides:

> "The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions . . ., by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding . . . ."

Does the injury for which Plaintiff seeks compensation result from "the performance of medical . . . or related functions" by Defendant Gaia while acting within the scope of her

---

[8] The FTCA functions as a legal mechanism for compensating persons injured by negligent or wrongful acts of federal employees only, committed within the scope of their employment.  See 28 U.S.C.A. §§ 1346(b), 2671-2680.

office or employment? This Court concludes that under its plain meaning, § 233(a) covers the conduct of Defendant Gaia. In his complaint, Plaintiff alleges he informed Defendant Gaia that he was deriving little relief from the epidural injections he had received and requested alternative treatments. He claims he was repeatedly seen by Defendant Gaia (and Defendant Prince) for the same problem and neither recommended any new treatment or approach to his chronic back, neck, and shoulder pain.[9] The alleged unconstitutional conduct thus occurred within the scope of Defendant Gaia's employment and during the course of her "performance of medical . . . or related functions." Plaintiff's exclusive remedy for his alleged injuries caused by that behavior is therefore against the United States under the FTCA— jurisdiction Plaintiff has not claimed. In reaching this conclusion, this Court relies on the reasoning set forth in Cuoco v. Moritsugu:[10]

> Section 233(a) "protects commissioned officers or employees of the Public Health Service from being subject to suit while performing medical and similar functions by requiring that such lawsuits be brought against the United States instead. The United States thus in effect insures designated public health officials by standing in their place financially when they are sued for the performance of their medical duties. Cf. 42 U.S.C. § 233(f) (listing alternative forms of insurance government can procure for public health officials when remedies against United States are likely to be precluded). The statute may well enable the Public Health Service to attract better qualified persons to perform medical, surgical and dental functions in order better to serve, among others, federal prisoners. '[W]hen defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective' the plaintiff is barred from

---

[9] In his response to Defendants' motion (doc. 33), Plaintiff does not mention Defendant Gaia at all, and instead alleges that upon his arrival at the FCI in Forrest City he notified Defendant Prince of his lower back, neck, and shoulder pain as well as his inability to obtain relief from the epidural injections he had received.

[10] 222 F.3d 99, 108 (2d Cir. 2000).

> bringing a Bivens action. Carlson v. Green, 446 U.S. 14, 18-19 (1980) (emphasis in original). We think that § 233(a) is just such an alternative remedy. See id. at 20 (citing § 233(a), in the Bivens action context, as an example of a statutory provision that explicitly designates an action under the Federal Tort Claims Act as the exclusive remedy)."

Id. See also Raby v. Union County Jail, No. CIV 04-4083, 2005 WL 1205555 at *2 (D. S.D. May 18, 2005) (citing Cuoco) (granting motion to substitute United States as a defendant and dismissing action for failure to exhaust administrative remedies under the FTCA; recognizing that the FTCA is the exclusive remedy for specified actions against members of the Public Health Service and that such lawsuits be brought against the United States instead). Last, the Court notes that Defendant Gaia's position as a Public Health Service official does not alone render her immune from suit. Pivotal to Defendant Gaia's immunity is the fact that her complained of conduct occurred entirely in her capacity as a medical care provider in the course of rendering medical treatment to Plaintiff. For this reason, Plaintiff's claims against Defendant Gaia must also be dismissed.

### 3. Defendant Prince

Defendant Prince, a treating physician, contends that Plaintiff's disagreement with his course of medical treatment does not rise to the level of a constitutional violation. She further asserts that Plaintiff has been under medical staff's constant care for complaints related to his back, neck, and shoulder since his arrival at the FCI in Forrest City. Last, Defendant Prince contends that Plaintiff has not established that her medical judgment in connection with the denial of the type of treatment he would like to receive (i.e., surgical intervention) has adversely affected his prognosis.

Plaintiff contends that he received his first MRI on October 18, 2002, while incarcerated at the FCI in La Tuna, Texas. Plaintiff alleges that Dr. Palafox diagnosed him

as suffering disc herniation at L5-S1 centrally and to the right; and disc protrusion or herniation at L4-5 centrally and to the left, based on the MRI.  Plaintiff claims that on December 12, 2002, Dr. C.D. Layumas, Clinical Director of the FCI La Tuna facility, classified him as a surgical candidate with chronic lower back and right leg pains with numbness, and recommended epidural steroid injections.  On July 23, 2003, Plaintiff received his first of a series of ESIs, which, he contends, proved futile, as did the numerous anti-inflammatory pain medications he was prescribed.  Prior to completing the ESI series, Plaintiff was transferred to the FCI in Forrest City.  On September 30, 2003, Plaintiff was seen in the FCI Forrest City medical department and voiced his complaints of lower back, neck, and shoulder pain to Defendant Prince.  Plaintiff advised Defendant Prince of the ESI protocol given at La Tuna, the futility of the treatment, as well as the futility of the pain medication administration.  He also voiced his concerns about future medical problems and drug addiction.  Plaintiff contends he asked Defendant Prince for alternative treatments in relation to his medical condition.  As a result of Defendant Prince's failure and delay in providing him with adequate treatment, Plaintiff alleges that his medical condition continues to deteriorate, causing numbness in both lower extremities and hips, and further causes him difficulty walking, sitting, and standing.

Giving Plaintiff the benefit of all reasonable factual inferences, the Court agrees that he suffers from an objectively serious medical need that mandates treatment.  However, he can neither establish that Defendant Prince deliberately disregarded those needs nor can he meet the requirement of proving that any delay has amounted to deliberate indifference.  For these reasons, his claims against Defendant Prince cannot survive.  It is clear, after reviewing the evidence, that Plaintiff's chief complaint is that he disagrees

with Defendant's conservative approach to treatment for his back, neck, and shoulder pain and instead believes that surgery is indicated.

According to the declaration of Defendant Prince, filed under seal (see doc. 12, Exh. I), medical records show that Plaintiff first complained of neck and shoulder pain on July 15, 1997.[11] The notes indicate it had been going on for at least three months. He was seen at a follow-up visit the same month and did not complain of neck and shoulder pain again until July 20, 1999. X-rays revealed that the shoulder was normal with no fracture or dislocation noted. At the time, Plaintiff stated that he had injured his shoulder two years prior when he lifted a heavy container to pour out its contents. A medical entry dated August 15, 1999, indicates that Plaintiff's left shoulder was much improved with better range of motion and less pain. He did not complain of shoulder or lower back pain again until the following July, after he was transferred to the FCI in Victorville. In 2001, Plaintiff's complaints were more frequent and he was given medication for pain management without incident. On June 28, 2001, Plaintiff was transferred to the FCI in La Tuna. On August 28, 2001, Plaintiff indicated that he had a history of lower back pain that he attributed to a fall from a roof at age ten. X-rays were ordered and showed no evidence of fracture, dislocation, or malalignment, but did note mild narrowing of the disc space at L5-S1, suggesting early osteoarthritic changes. Plaintiff was prescribed Flexeril, a muscle relaxer, and he reported to medical services every few months for medication refills— medication Plaintiff claimed was helping him. On June 11, 2002, Plaintiff indicated to medical personnel at the FCI in La Tuna that he had had chronic lower back pain for the past eight years, with no history of injury. He rated his pain a "3" on a scale of 0-10. An MRI of the

---

[11] There is a February 17, 1996, medical record entry that indicates Plaintiff injured his lower back playing handball.

lumbar spine was done on October 18, 2002. The findings again showed no fracture or dislocation, but a mild narrowing of the disc space at L5-S1, suggesting early osteoarthritic changes.[12] Surgery was not recommended. Plaintiff continued on pain medication, was issued restrictions for no heavy lifting or contact sports, given a back support/abdominal binder, and allowed use of an extra pillow. Plaintiff received his first epidural injection in February 2003. Later that year he was transferred to the FCI in Forrest City.

In December 2003, Plaintiff reported to medical personnel that he had a three-year history of lower back pain. He was referred to the orthopedic clinic and on December 12, 2003, he was scheduled a consultation at the pain management clinic with Dr. Parker. In April 2004, Plaintiff reported to sick call with back pain and complained that an epidural injection given in December had not worked well and he wanted to know what the next step in treatment involved. He was prescribed Naproxen 550mg twice daily for ninety days. In November 2004, Plaintiff submitted an inmate request to medical staff complaining that the steroid injections made him worse so the order was discontinued. In January 2005, Plaintiff presented for medication refills and at the time indicated that his pain was a "0" on a scale of 0-10. He was observed ambulating without difficulty and his back was not tender. On June 24, 2005, he complained of pain and requested surgery but again he ambulated without difficulty and conservative treatment of pain management was continued. Plaintiff was seen at follow-up visits in October 2005,[13] and February 2006.[14] Due to his history of chronic pain, x-rays of the cervical spine and right shoulder were taken

---

[12] Disc herniation at L5-S1 centrally and to the right, and disc protrusion or herniation at L4-5 centrally and to the left.

[13] Plaintiff indicated that he was in constant pain that day (rating his pain a "7" on a scale of 0-10), and that the pain was worse at night.

[14] Plaintiff claimed to be doing yoga three to four times a week at this time.

13

on February 7, 2006.  The cervical spine film showed normal alignment with mild degenerative changes.  Films of the right shoulder showed no evidence of fracture or any other abnormality, normal joint spaces with unremarkable soft tissues, also with mild degenerative changes.  Plaintiff again demanded surgery on March 21, 2006.  He was advised by Defendant Prince that surgery was not clinically indicated as he was able to maintain daily activities and his pain could be managed conservatively with medication and exercise.  Defendant Prince further advised Plaintiff that if it was his preference to have surgery, he should put in a transfer to the federal system as a worker where specialists are available to reassess him.  Plaintiff requested that Defendant Prince write the transfer and she refused, explaining that she would only write transfers for patients in life and death situations, which he was not.  Plaintiff has regularly been seen for follow-up visits since.

According to the declaration of Hipolito Matos, M.D., FCI Forrest City Clinical Director, filed under seal (see doc. 12, Exh. J), Plaintiff remained under the care of Defendant Prince until July 2007, at which time she became a staff physician at the FCC in Memphis, Tennessee.  On October 20, 2007, a radiologic on-site MRI was conducted.  The thoracic spine vetebral bodies appeared normal with no disc herniation identified, normal soft tissues, and no acute abnormalities.  The MRI of the cervical spine showed degenerative changes involving the C3-C6 with anterior and posterior osteophyte formation, but no disc herniation present and vertebral bodies appearing otherwise normal with no fractures or dislocations.  The results indicated normal findings with arthritis in the neck area.  Plaintiff disagreed with the MRI findings, believed he was improperly diagnosed, and requested physical therapy or a consult with a specialist regarding his right shoulder.  These requests were denied as not medically indicated.

In sum, the medical records suggest that Plaintiff has been seen repeatedly by medical personnel for over a decade. He has been offered numerous narcotic and non-narcotic pain medications, epidural/steroid injections, pain management clinic, accommodations (a lower bunk, special pillow, a medically classified status), and exercise to alleviate his symptoms. He has demanded surgical intervention but medical personnel contend that surgery is not indicated and could result in a more harmful outcome— physical limitation and disability. He has been advised that he may apply for a transfer within the federal system where specialists are available to reassess him. The records further show that Plaintiff has maintained his daily living activities without extensive difficulty, he has been observed during all medical visits ambulating without difficulty, he has indicated that he can exercise regularly, and he is not in incessant pain. Under these circumstances, it simply cannot be said that Defendant Prince deliberately disregarded Plaintiff's medical needs. Most significant, Plaintiff has failed to come forth with anything other than his own personal opinion that the denial of surgery has adversely affected his prognosis— an opinion that is at odds with his most recent MRI. Plaintiff's disagreement with his course of medical treatment simply does not equate to a constitutional claim. Last, the Court notes that Plaintiff may have misunderstood whether surgical intervention has ever been suggested in the traditional sense of the definition. Although Dr. Layumas did indicate that Plaintiff was a surgical candidate (<u>see</u> doc. 12, Exh. F, consultation sheet dated February 14, 2003, filed under seal), he recommended epidural steroid injections— <u>a surgical procedure</u> according to the medical records (<u>see</u> doc. 12, Exh. F, Pan American Community Hospital outpatient history & physical reports, anesthesia records, operative records, post operative / post procedure progress notes, filed under seal).

**C.	Doe Defendants**

Although Defendants do not raise the issue, the Court notes that Plaintiff has named as Defendants "John & Jane Does, Medical Director." By order entered May 28, 2008 (doc. 23), Plaintiff was instructed that he should attempt to determine the identity of these Defendants through the use of discovery. He was further advised if no motion to amend or join the identified parties as Defendants was made on or before September 26, 2008, subject to extension for good cause, it would be recommended that the Doe Defendants be dismissed. To date, no Doe Defendant has been identified.

Federal Rule of Civil Procedure 4(m) states in relevant part: "If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff,[15] shall dismiss the action without prejudice as to that defendant . . . ." Id. No Doe Defendants have been identified or served, no extension has been requested, and the one hundred twenty day time period ran on September 26, 2008. For this reason, Plaintiff's claims against the Doe Defendants are dismissed.

### IV. Conclusion

In accordance with the above, IT IS, THEREFORE, ORDERED that:

1.	Defendants' motion to dismiss (doc. 11) is GRANTED and Plaintiff's case is hereby dismissed in its entirety WITH PREJUDICE.

2.	Any pending motions are DENIED AS MOOT.

---

[15] Not only has Plaintiff been warned if no motion to amend or join the identified parties as Defendants was made that the Doe Defendants would be subject to dismissal, this memorandum opinion and order serves as additional sufficient notice to Plaintiff.

3.      The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that AN IN FORMA PAUPERIS APPEAL from this order and any judgment entered hereunder, WOULD NOT BE TAKEN IN GOOD FAITH.

4.      This dismissal counts as a "STRIKE" as frivolous pursuant to 28 U.S.C. § 1915(g).[16]

IT IS SO ORDERED this 9th day of February, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

---

[16] Section 1915(g) provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under [the in forma pauperis statutes] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.